## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **JESSICA P. STEWART,** | : | |
| *Plaintiff* | : | |
| | : | **C.A. No.: 25:1-cv-** |
| **V.** | : | |
| | : | |
| **PROVIDENCE COLLEGE,** | : | **Jury Trial Demanded** |
| **alias,** | : | |
| *Defendant* | : | |

## COMPLAINT

### I.    Introduction

1.    This is an action brought by Plaintiff Jessica P. Stewart ("Plaintiff" or "Dr. Stewart"), against the Defendant Providence College, alias ("PC" or "Defendant"), seeking compensatory, punitive, and treble damages, counsel fees, costs, and other equitable relief arising out of unlawful discrimination in employment that Dr. Stewart has suffered on account of her gender and retaliation for objecting to discriminatory practices of Defendant in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. ("Title VII"), the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws §28-5-1, *et seq*. ("FEPA"), the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1, *et seq*. ("RICRA"), and the Rhode Island Whistleblower Protection Act, R.I. Gen. Laws § 28-50-1, *et seq.* ("RIWPA").

2.    This case arises from a sustained campaign by PC's most senior leadership to eliminate a respected female leader who repeatedly objected to unlawful and discriminatory practices within the institution.  Dr. Stewart, a licensed clinical psychologist and one of the only women in a leadership role within PC's Athletics Department, was demoted, isolated, and ultimately terminated in retaliation for raising concerns about gender-based discrimination and pay disparities, exclusion from institutional decision-making, and the racially disparate treatment of

Black student-athletes and staff.  Despite years of exemplary service and her central role in building PC's clinal sports psychology program, PC erased Dr. Stewart's professional presence, stripped her of title and pay, barred her from continuing to serve student-athletes, and formally ended her employment.  Though PC publicly claims a commitment to justice, equity, and the dignity of every person, its actions toward Dr. Stewart reflect a deliberate effort to punish integrity, silence protected advocacy, and preserve institutional power at the expense of accountability.

3.      Dr. Stewart brings this action to hold PC accountable for unlawful retaliation, gender discrimination, and the silencing of a professional who chose integrity over silence and accountability in the workplace.

## II.      Parties

4.      Plaintiff Jessica P. Stewart is a resident of the City of Providence, County of Providence, and State of Rhode Island.

5.      Defendant Providence College is a domestic non-profit corporation duly organized under the laws of the State of Rhode Island with a principal place of business located at 1 Cunningham Square, Providence, RI 02918.

## III.      Jurisdiction

6.      This Court has federal subject matter jurisdiction over this case pursuant to the provisions of 28 U.S.C. §1331 because Dr. Stewart asserts claims arising under federal law; specifically, Title VII, 42 U.S.C. §2000e, *et seq*.  This Court has supplemental jurisdiction over the state law claims set forth herein predicated on 28 U.S.C. §1367 because they arise out of the same case or controversy.

### IV.    Venue

7.    Pursuant to the requirements set forth in 28 U.S.C. §1391, venue is proper in this Court insofar as PC may be found in Rhode Island and therefore is deemed to reside in the District of Rhode Island.  Moreover, a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island.

### V.    Exhaustion of Administrative Remedies

8.    On or about September 27, 2024, Dr. Stewart filed a Charge of Discrimination with the Rhode Island Commission for Human Rights ("RICHR" or "the Commission") and the United States Equal Employment Opportunity Commission ("EEOC") against Defendant alleging discrimination on the basis of gender.

9.    Thereafter, more than one hundred and twenty (120) days but less than two (2) years having elapsed since the filing of Dr. Stewart's charge of discrimination, Dr. Stewart elected to terminate the RICHR and EEOC proceedings and have this matter heard in Court pursuant to R.I. Gen. Laws § 28-5-24.1(a).

10.    On or about April 11, 2025, the RICHR issued Dr. Stewart a Notice of Right to Sue

11.    On or about June 3, 2025, the EEOC issued Dr. Stewart a Notice of Right to Sue

12.    Accordingly, Dr. Stewart has timely and properly exhausted her administrative remedies and thereby satisfied all pre-conditions to bringing the within action.

13.    There is no requirement under the RICRA or RIWPA that a plaintiff exhaust administrative remedies.

14.    To the extent any allegations of discrimination or retaliation fall outside the one-year statute of limitations under the FEPA and the 300-day statute of limitations under Title VII of the Civil Rights Act, such claims are nevertheless timely brought pursuant to the three-year

statute of limitations for claims of discrimination under the RICRA and claims of retaliation under the RIWPA.

15.     Dr. Stewart's claims of retaliation for complaining about race and color-based discrimination are asserted under the RIWPA and are therefore subject to and timely within the applicable three-year limitations period.

## VI.    Facts

### Dr. Stewart's Employment Background

16.     At all relevant times, Dr. Stewart was one of the few women in an athletics leadership role at PC in a department that is otherwise predominantly led by males.

17.     Dr. Stewart was initially hired by PC in or about October 2019 as a Clinical Sports Psychologist at an hourly rate of $100 per hour with no benefits.

18.     When she was hired and throughout the entirety of her time with PC, Dr. Stewart was always clear, explicit, and transparent about being unable to work a traditional, salaried, nine-to-five (9-5), Monday-through-Friday position due to the nature of mental health counseling for student athletes and her personal family commitments.

19.     That is, providing mental health counseling services within the traditional 9-5 modality is ineffective within this context of student-athlete counseling.  Research supports that one of the significant barriers to effective mental health treatment for student athletes on college campuses is the adherence to traditional 9-5 work hours by clinical and administrative staff.

20.     Accordingly, Dr. Stewart would often work late into the night and on weekends to accommodate athletics/student athlete needs, which meant that she needed flexibility during weekdays to fulfill her family commitments.

21.    To accomplish both, Dr. Stewart had significantly shrunk her private practice during her tenure with PC after being requested to do so by PC's administration.

22.    PC was aware of this and assured Dr. Stewart at her time of hire that this was not an issue.

23.    As a Clinical Sports Psychologist, Dr. Stewart provided clinical mental health services to individual student-athletes and teams, delivering psychotherapy, group interventions, and performance enhancement strategies.

24.    In this role, Dr. Stewart's job duties included conducting comprehensive psychological assessments, developing treatment plans and providing ongoing therapeutic care, collaborating with coaches, medical staff, and counseling center clinicians to offer integrated support for student-athlete mental health, and addressing psychological challenges related to injury, performance, and personal stressors.

25.    Dr. Stewart also engaged in crisis intervention, consultation, outreach efforts to enhance awareness of mental health resources and promote a healthy team culture, and participated in Counseling Center case conferences.

26.    As stated above, due to the nature of the work of a clinical sports psychologist, particularly within a Division 1 athletics setting, being available to work outside of the traditional nine-to-five (9-5), Monday-through-Friday workweek is essential.

27.    As such, in order to provide the services and do the job duties PC required of her, Dr. Stewart's  flexible, non-traditional schedule was essential to both her and PC.

28.    PC was at all times aware of this schedule and that Dr. Stewart would work these hours; indeed, she was often asked to do so by agents of PC and was commended for her willingness to work such hours.

29.     During her time employed by PC, Dr. Stewart reported to Executive Director, Personal Counseling Center ("PCC") Rosemary Mugan ("Dr. Mugan").

30.     While she reported to Dr. Mugan, was part of the PCC, and was technically employed as part of Student Affairs, Dr. Stewart was fully embedded in and effectively a member of the Athletics Department.

31.     In fact, Dr. Stewart had an office in the Athletics Department, was included in Athletics Department staff mailings, meetings, events, and directories, was included in bi-weekly Athletics Department Senior Staff Meetings, and chaired multiple committees and committee meetings in the Athletics Department with Athletics personnel.

32.     In May 2022, PC requested that Dr. Stewart take the lead in launching the Student-Athlete Psychological Services ("SAPS") program, and Dr. Stewart was promoted to Assistant Director, Head of Student-Athlete Psychological Services.

33.     When Defendant requested that she take the lead in launching SAPS, Dr. Stewart requested that  PC make a commitment to her in exchange for taking on this large project.

34.     Following this promotion, Dr. Mugan contacted Defendant's Human Resources Department stating that "Mr. Steven Sears [("Mr. Sears") (Vice President for Student Affairs and Dean of Students)] has approved a title change for Dr. Jessica Stewart to Assistant Director of Student-Athlete Psychological Services in the PCC.  Can we please start the process with you so that it is reflected in the system appropriately?"

35.     However, despite the promotion and increased title, responsibilities, and workload, PC did not increase Dr. Stewart's pay rate or offer her benefits.

36.     As Assistant Director, Head of SAPS, Dr. Stewart led the initial establishment of the SAPS program, taking on strategic development work while continuing to handle clinical

responsibilities. The SAPS program was a novel program that Dr. Stewart created throughout her career and customized to fit PC.

37.    In doing so, Dr. Stewart worked closely with university administration and athletic leadership to gain approval for new mental health positions while actively recruiting and hiring qualified clinicians, managing a full clinical caseload, providing individual therapy and group interventions, and providing consultation services for coaches, athletic staff, and medical professionals.

38.    This role involved building the foundation for an integrated mental health program, developing protocols and policies for service delivery, laying the groundwork for future program expansion, and engaging in ongoing collaboration with campus partners to ensure the successful launch and long-term sustainability of the SAPS program.

39.    Dr. Stewart led the search for a new nutritionist—a position housed in Athletics— after PC committed that Dr. Stewart would lead the launch of "Mind-Body Excellence," an integrated sport science program that she had proposed.

40.    That program was designed to oversee Sport Science, SAPS, and Nutrition, and would have expanded Dr. Stewart's oversight within the Athletics Department.

41.    In May 2023, Dr. Stewart was promoted to Associate Director, Director of SAPS.

42.    Despite the second promotion coming with an increase in title, responsibilities, and workload, PC again did not increase Dr. Stewart's pay rate or offer her benefits.

43.    As Associate Director, Director of SAPS, Dr. Stewart oversaw the development and implementation of comprehensive mental health and sport science services tailored specifically to student-athletes, including individual therapy, group interventions, and team-based mental performance workshops.

44.     In this role, Dr. Stewart collaborated closely with athletic department leadership, coaching staff, and medical professionals to create an integrated support system addressing the unique psychological needs of athletes while managing a team of clinicians, providing supervision and guidance, and developing training programs to ensure high-quality care and professional development.

45.     Additionally, Dr. Stewart managed crisis situations, offering emergency interventions and consultations, and established proactive measures to effectively manage critical incidents, such as the death of a student, ensuring a rapid and supportive response to those affected.

46.     Again, Dr. Stewart could not provide these services if she was required to work a regularly scheduled, 9 to 5 schedule.

47.     As Associate Director, Director of SAPS, Dr. Stewart also engaged in cross-campus collaboration to build partnerships, streamline mental health services, and improve access for student-athletes, and provided strategic leadership to ensure compliance with NCAA regulations and promote mental health advocacy within the broader collegiate sports community.

48.     Throughout Dr. Stewart's employment with PC, she was a high-performing employee who consistently received positive feedback regarding her job performance from PC and had no history of performance deficiencies nor any prior disciplinary history and was a loyal and exemplary employee as shown by her promotions.

49.     In addition to the objective success of Dr. Stewart's work performance as evidenced by clinical data, she was regularly asked to present her program at fundraising events, meet with donor families, and to represent the PCC and Student Affairs at trustee meetings to present the program she developed.

50.     In fact, Dr. Stewart's work performance resulted in increased engagement from student-athletes and athletics staff with PCC services and a significant decrease in student-athlete emergency service needs.

51.     This was contrary to data for the non-student-athlete population. During Covid specifically, student engagement was significantly down in college counseling centers across the country and at PC.  However, student-athlete engagement at PC increased.

52.     Dr. Stewart was informed that, after Covid, psychiatric emergencies at PC rose among the non-athlete population in line with national numbers while student-athlete psychiatric emergencies decreased. Engagement continued to rise in student-athletes demonstrating effective proactive management of student-athlete mental health.

### *Gender Discrimination*

53.     Notwithstanding the above, at all relevant times, PC and its agents failed and/or refused to treat Dr. Stewart's gender in a neutral manner and instead subjected her to a hostile work environment on account of her being a woman.

54.     For example, as stated above, Dr. Stewart did not receive any monetary raises throughout her tenure with PC, despite having a consistent increase in title, responsibilities, and hours allocation in part in response to PC's requests for Dr. Stewart to develop and launch a comprehensive psychological services program for student-athletes.  In fact, Mr. Sears specifically told Dr. Stewart to "work as many hours as you can or are willing to work to build an effective program" in Dr. Mugan's presence.

55.     Despite the increase in workload, responsibilities, and title, Dr. Stewart's pay increased only as a result of increased hours worked, but her pay rate remained unchanged.

56.    On information and belief, PC routinely provides pay rate increases to and/or negotiates compensation with male employees who are promoted and/or receive an increase in title, responsibilities, and workload.

57.    For example, on information and belief, Steven Napolillo ("Mr. Napolillo") (Vice President/Athletic Director) was paid more than others in his "pay grade" for years with donor money.  Like Dr. Stewart, he was a high-performing employee. Unlike Dr. Stewart, PC made efforts, took action, and did what was necessary to make sure he was compensated accordingly. -

58.    Throughout Dr. Stewart's employment with PC, she was often the only woman and female in the room during meetings regarding the program and her position.

59.    Among others, Dr. Stewart was treated in a discriminatory fashion by male colleagues, including Mr. Napolillo who told her to "smile more and be less direct" after a meeting.

60.    Such feedback would not have been provided if  Dr. Stewart were a male.

61.    Moreover, throughout her employment with PC, it was a continual challenge for her as a woman to advocate for career promotion and program stability while also balancing PC's and its male agents' stereotypical perceptions of confidence or ambition, which women are often scrutinized for exhibiting.

62.    In fact, throughout Dr. Stewart's employment with PC, she often witnessed women being misrepresented in meetings where they were not present, often for the purpose of male colleagues protecting and/or promoting themselves.

63.    For instance, Mr. Napolillo and Mr. Sears would falsely claim that they could not give Dr. Stewart raises because other women in the department, including Dr. Mugan, would not feel comfortable making less than she does.

64.     Indeed, when Dr. Stewart's potential salary as a full-time, permanent employee was being discussed, Mr. Sears advocated for Dr. Stewart having a lower salary, questioned Human Resources grading of the proposed position, expressed "surprise that it graded that high" and suggested a low salary, citing Dr. Mugan's role as a basis for his advocacy of a lower salary for Dr. Stewart.

65.     In contrast, this treatment was markedly different than how Mr. Napolillo was treated by PC.  It does not appear that Mr. Napolillo was shamed or told that it simply was not possible to pay him what was promised.

66.     This was done as an effort to cause internal friction among women/female staff instead of addressing the fact that women, including Dr. Stewart, were disparately paid at lower rates than males.

67.     Indeed, on more than one occasion, Dr. Mugan told Dr. Stewart that she was disappointed and frustrated with the false statements being attributed to her by Mr. Napolillo and Mr. Sears and supported Dr. Stewart seeking a pay rate increase.

68.     Moreover, Mr. Napolillo and Mr. Sears would attempt to shame and guilt Dr. Stewart into accepting and staying quiet about disparate pay by telling her that because of her, other women were now also seeking raises.

69.     Additionally, at times during Dr. Stewart's employment with PC, her work was attributed to men perceived as influential, despite it being her contribution.

70.     For example, during a cross divisional meeting on August 7, 2023, Mr. Napolillo introduced the SAPS program, crediting Kyle McInnis ("Mr. McInnis") (Sr. Advisor to the President and Inaugural Dean, School of Nursing and Health Sciences) by saying, "under Kyle's

leadership, Jess and her team have developed a groundbreaking program" to support student-athlete mental health and integrative mind-body excellence.

71.    In reality, Mr. McInnis did not supervise Dr. Stewart's work at any point.  At the time of this meeting, she had only ever met him twice, Mr. McInnis's leadership in the nursing school did not overlap with her work in Student Affairs or Athletics, and she was never in Mr. McInnis's "chain of command" or under his supervision in any organizational chart.

### Dr. Stewart's Complaints of Race-Based Discrimination at Providence College

72.    Beginning in April 2023, Dr. Stewart raised explicit concerns about racial dynamics on campus and how PC was managing these issues both publicly and internally.

73.    On or about March 22, 2023, Dr. Stewart reported to Dr. Mugan that a Black clinician, Meeckral Searight, was being treated with hostility by White colleagues at the Providence College Counseling Center, including being subjected to racially biased and baseless, stereotypical accusations, and that Dr. Stewart believed the accusations were racially motivated.

74.    In late March 2023, following the resignation of Men's Basketball Coach Ed Cooley, a Black male, Dr. Stewart raised concerns to Dr. Mugan and John Rock [("Mr. Rock") (Senior Associate Director for Health and Wellness)] that the backlash directed at Mr. Cooley was racially charged, abusive, and intrusive, and that Providence College's failure and refusal to publicly denounce the racist undertones of this backlash signaled institutional indifference to anti-Black sentiment.

75.    In or around April 2023, Dr. Stewart raised concerns to Dr. Mugan, John Rock, Kevin Kurbec ("Mr. Kurbec") (Associate Athletic Director, Men & Women's Basketball Team), and Mr. Sears that Alyn Breed, a Black student-athlete who was arrested and released, was receiving less institutional support and resources than White students and that PC's response

appeared to reflect institutional discomfort with defending a Black student in the eyes of donors and the broader public, thereby reinforcing a racially discriminatory double standard.

76.    Dr. Stewart further stated that PC's earlier silence and, in some cases, inflammatory messaging around the vilification of Ed Cooley, contributed to a climate in which the similarly harsh treatment of Black students like Mr. Breed was tolerated, thereby reinforcing a racially hostile environment.

77.    Dr. Stewart expressed concern for the emotional and psychological impact on Mr. Breed and the predominantly young men of color on the Men's Basketball Team, highlighting the unique burdens they face navigating a predominantly White campus without equitable support or resources.

78.    Around this time, Dr. Mugan warned Dr. Stewart to "be careful" about how she approached Mr. Sears with these concerns as he might not respond well.

### *Dr. Stewart's Initial Complaints of Gender-Based Discrimination at Providence College*

79.    Throughout Dr. Stewart's employment with PC, she had ongoing conversations with her direct supervisor, Dr. Mugan, regarding the discriminatory gender dynamics and practices within the campus.

80.    On May 5, 2023, Dr. Stewart met with Mr. Sears and Mr. Napolillo to discuss gender-related challenges she experienced under their leadership, including being repeatedly spoken over in meetings and having male colleagues derail agendas that she had prepared.

81.    During this meeting, Dr. Stewart articulated her desire to work collaboratively and constructively, while also clearly communicating how gender dynamics were impacting her ability to contribute effectively in her leadership role.

*Initial Retaliation by Providence College*

82.    During Summer 2023, outward indicators suggested Dr. Stewart's role was secure, including the official launch of the program, the hiring of a full-time support employee, and plans to create new office space.

83.    Additionally, Dr. Stewart was actively working to formalize her position with PC under the direction of Mr. Sears after having previously been assured that the terms she had long been guaranteed regarding autonomy, flexibility, and pay would remain intact.

84.    However, subtle but meaningful shifts began to occur in how Dr. Stewart was treated in the workplace.

85.    For example, Dr. Stewart began receiving vague or contradictory feedback from her supervisor.

86.    Moreover, Dr. Stewart noticed a change in how she was spoken to by senior leadership, including Mr. Sears.

87.    Additionally, Dr. Stewart became aware through Dr. Mugan that Mr. Sears had started making disparaging remarks such as "It's not all about Jess," comments that marked a sharp contrast from how Dr. Stewart was previously treated.

88.    Dr. Stewart also began to feel a growing sense of unease in her professional interactions with male colleagues, leading her to second-guess how she dressed, styled her hair, and carried herself in meetings in an effort to navigate a male-dominated leadership team and workplace culture that seemed to increasingly penalize her for being a visible, assertive, and/or ambitious woman and for being vocal regarding gender and racial disparities at PC.

89.    These changes culminated in a pattern of strategic distancing by senior leadership from Dr. Stewart's role, masked by superficial engagement, which Dr. Stewart believes was in

retaliation for her protected complaints regarding both racial and gender discrimination and her advocacy on behalf of students and colleagues of color.

***Additional Complaints and Retaliation in Fall 2024 and***

90.    On November 16, 2023, Dr. Stewart presented concerns of sex/gender-based discrimination within PC's organization against herself and other female colleagues during an in-person meeting with PC's leadership, specifically Patricia Beland (Director of HRIS and Compensation Specialist), Mirlen Annette Mal ("Ms. Mal") (Senior Associate Vice President of Human Resources), and Dr. Mugan.

91.    During that meeting, Dr. Stewart reported the following concerns:

   a.  that "it is not lost on me that I am often one of, if not the only, woman in the room" during meetings about my program and position;"
   b.  a general acknowledgment of lack of influence/power compared to men in workplace meetings;
   c.  that a previously more gender and racially diverse cabinet had become increasingly white and male;
   d.  an incident where Mr. Napolillo told Dr. Stewart to "smile more and be less direct" after a meeting with him and Mr. Sears.  Dr. Stewart stated that she did not believe that this feedback would have been given if she were male;
   e.  the challenges Dr. Stewart faced as a woman throughout her employment with PC in advocating for career promotion and program stability while also balancing PC's and its male agents' stereotypical perceptions of confidence or ambition that women are often scrutinized for exhibiting;
   f.  that Dr. Stewart witnessed women being misrepresented in meetings where they were not present, often for the purpose of male colleagues protecting and/or promoting themselves; and,
   g.  that her work had been attributed to men perceived as influential, despite it being her contribution.

92.    During that meeting, Dr. Stewart expressed a fear of retaliation for raising concerns about discrimination and the unequal treatment in her work environment, including being told to change behavior (i.e., smile more) to make male colleagues more comfortable.

93.    Dr. Stewart also mentioned that other females working for PC had also shared fears of being seen as insubordinate for challenging the male-dominated status quo and that there was a

general unspoken awareness of these gender issues among employees, but that they were not addressed openly due to fear of retaliation.

94.    During that meeting, Dr. Mugan concurred with Dr. Stewart's concerns and stated that she too feared being perceived as insubordinate if she spoke up.

95.    Shortly after the November 16, 2023, meeting, Mr. Sears limited his communication with Dr. Stewart after informing her that he met with HR regarding the meeting where Dr. Stewart presented concerns of sex/gender-based discrimination.

96.    On information and belief, on or about November 21, 2023, Mr. Napolillo met with HR to follow up on the November 16, 2023 meeting and subsequently also limited his communications with Dr. Stewart.

97.    Also, on or around the November 2023 Thanksgiving break, PC had a series of internal meetings without Dr. Stewart present that focused on the future of her employment with PC, including sensitive salary information, with a group of approximately ten (10) colleagues.

98.    None of those employees maintained communication with Dr. Stewart during that time and several later told her that they were not allowed to speak with her.

99.    Additionally, following the November 16, 2023, meeting, Dr. Stewart was almost immediately isolated from her colleagues, her confidential employment information was shared with others, she was demoted in both title and responsibilities, PC instructed other staff members not to speak with her, and she was forced to accept a new work schedule with forty-percent (40%) more on-campus time but a forty-percent (40%) pay cut.

100.    On information and belief, PC, by and through its agents, engaged in the above and below referenced retaliatory actions against Dr. Stewart in an effort to drive her to resign from her employment with PC.

101.    On or about December 7, 2023, Dr. Stewart was called into an in-person meeting with Ms. Mal, and Dr. Mugan, Mr. Napolillo, Mr. Rock, and Mr. Sears.

102.    Dr. Stewart asked to record the December 7, 2023, meeting and subsequent meetings with HR as an accommodation for her documented disabilities, ADHD and Dyslexia, which PC had previously allowed and accommodated.

103.    However, this time, PC denied Dr. Stewart's request for accommodations.

104.    During the December 7, 2023, meeting, Ms. Mal informed Dr. Stewart that her then-current role, Associate Director, Director of SAPS, in which she had been earning approximately $165,000 annually, would no longer exist.

105.    Ms. Mal also informed Dr. Stewart that PC was offering the role of "Consulting Clinical Psychologist for Student-Athletes " with a salary of $110,000 with benefits, which was a $55,000 reduction in annual compensation.

106.    Subsequently,  Mr. Rock approached Dr. Stewart in the lobby and said he was "sorry."  Dr. Stewart replied, "What am I supposed to do?"  In response, Mr. Rock stated, "When that number was brought up in the meeting, Steven Napolillo said, 'There is no way she is going to be able to make that work.'"

107.    On information and belief, PC drastically reduced Dr. Stewart's compensation in the hopes that she would not be able to "make it work" and be forced to resign.

108.    In light of, among other factors, the timing of this demotion and pay cut in relation to Dr. Stewart's complaints of sex/gender-based discrimination and Mr. Napolillo's comments, it is clear that PC demoted Dr. Stewart and cut her compensation drastically in retaliation for reporting concerns of sex/gender-based discrimination in the workplace.

109.    Shocked and dismayed, Dr. Stewart responded that she would need time to consider the offer.

110.    On or about December 11, 2023, Dr. Stewart emailed the individuals present during the December 7, 2023, meeting to let them know that she needed more time to consider the offer and that she was enjoying the Hanukkah holiday with her mother, who was in Hospice.

111.    On or about December 13, 2023, Mr. Rock reached out to Dr. Stewart regarding a student-athlete, as was dictated by protocol if something was brought to his attention.

112.    Notably, while it was protocol that Mr. Rock would contact Dr. Stewart if a student-athlete situation came to him, standard protocol was for the coach to approach Dr. Stewart first about the situation.

113.    At the same time, Mr. Rock also informed Dr. Stewart that he had spoken to Kim English ("Mr. English") (Providence College Men's Basketball Coach), who had informed Mr. Rock that Mr. Napolillo had informed him that Dr. Stewart was leaving the college due to a salary disagreement.

114.    Accordingly, Mr. English would have approached Dr. Stewart first but for the rumors being spread by PC's administration.

115.    This situation deviated from the standard protocol that required coaches and trainers to contact Dr. Stewart directly regarding student-athlete concerns that, up until this point, had been adhered to.

116.    Additionally, as of December 13, 2023, Dr. Stewart had not yet decided whether to accept the role nor had she discussed it further with PC.

117.    Yet, high-ranking officials of PC were already telling key staff in athletics that Dr. Stewart was leaving over a salary dispute.

118.    This further supports the fact that PC, by and through its agents, was engaging in a concerted effort to drive Dr. Stewart to resign by deliberately offering a demotion and reduced salary that they fully expected her to decline.

119.    Dr. Stewart felt extremely humiliated and shocked as a result of this further confirmation of the retaliation and machinations against her.

120.    In fact, at the time Dr. Stewart was actively attempting to negotiate for an option that would allow her to maintain her employment without taking a forty percent (40%) pay cut and increasing her on-campus hours significantly.

121.    In response to Dr. Stewart's efforts to negotiate, Ms. Mal told Dr. Stewart that the initial offer from PC was final and that if she did not hear back from Dr. Stewart "by close of business on Jan. 2, I will consider the College's offer to be declined and I will have Rosemary be in touch with you regarding a transition and conclusion of your employment."

122.    This was done despite Dr. Mugan previously telling Dr. Stewart that there would be room to negotiate.

123.    In contrast, Trevor Cote ("Dr. Cote"), former Clinical Sport Psychologist at PC, a male who had worked under Dr. Stewart and later assumed Dr. Stewart's role upon her employment separation, was able to negotiate his salary.

124.    Additionally, as previously stated, PC can and has previously made internal adjustments or secured funds to maintain employment or secure additional compensation as it has previously done for Mr. Napolillo.

125.    For example, given Dr. Stewart's role and responsibilities, it would have made sense to move her to the Athletics Department, as is done in colleges/universities across the country and at PC with sports medicine and internal medicine staff.  To the extent PC claims it was bound

by uniform pay or employment structures within Student Affairs department, this would have eliminated the need to work within that structure.

126.    Again, PC has a history of compensating employees, particularly high performing employees such as Dr. Stewart, from fundraised money in athletics as was done with Mr. Napolillo for years.

127.    Because Dr. Stewart did not have any other options, she emailed Ms. Mal on January 1, 2024, stating that the offer "is not feasible for me to accept."

128.    As a result, PC moved Dr. Stewart into the role of Consulting Clinical Psychologist for Student-Athletes, stripping Dr. Stewart of her previous title of Associate Director, Director of SAPS for the remainder of her employment at PC.

129.    On or about January 15, 2024, Mr. English approached Dr. Stewart during men's basketball practice following a meeting he had with Mr. Napolillo regarding Dr. Stewart's "future with the program."

130.    Mr. English confided in Dr. Stewart that Mr. Napolillo told him, "this goes up to the president's office," that Mr. Sears and Father Kenneth Sicard ("Father Sicard") (President of Providence College) are "close," and Mr. Sears was attempting to leverage that to "turn [Father Sicard] against [Dr. Stewart]" in order to cut ties with her completely.

131.    Mr. English also told Dr. Stewart that Father Sicard "wants you gone."

132.    The fact that Father Sicard wanted Dr. Stewart "gone" was subsequently reiterated by several individuals.

133.    Mr. English informed Dr. Stewart that, after Mr. Napolillo informed him of these things, Mr. Napolillo asked, "does that sounds like a lawsuit to you?"

134.    Mr. Napolillo's comments about PC's actions leading to a lawsuit further demonstrate that Defendant was aware that its actions towards Dr. Stewart were unlawful.

135.    On January 15, 2024, Dr. Stewart received a text message from Mr. Napolillo telling her that he could no longer speak with her.

### *Discriminatory and Retaliatory Employment Termination*

136.    On January 22, 2024, Dr. Stewart attended another meeting with Jill LaPoint (Senior Associate Vice President/Deputy Athletic Director/SWA), Ms. Mal, Dr. Mugan, and Mr. Rock.

137.    During that meeting, Ms. Mal informed Dr. Stewart that her "temporary position" was being terminated effective May 17, 2024.

138.    Dr. Stewart understood from a previous email from Ms. Mal that "this meeting was not a negotiation or discussion," so she did not intend to engage in one.

139.    Rather, she replied acknowledging that she understood that she was being terminated by PC effective May 17, 2024, that she would maintain the highest ethical standards in her practice, as required by her license, and that she would continue collaborating with Dr. Mugan on student-athlete matters, as she had since 2019.

140.    Dr. Stewart then asked if she could be dismissed, to which Ms. Mal replied "yes," and Dr. Stewart left.

141.    Shortly after that January 22, 2024, meeting, Dr. Stewart attempted to access the parking lot near the RFDC (Athletics), but her ID card did not work.

142.    Of note, while PC classified Dr. Stewart as a "temporary employee," she was not previously treated or regarded as a temporary employee in practice as evidenced by her over four (4) years of employment with PC and her multiple promotions.

143.    Indeed, PC previously informed Dr. Stewart that her role was crucial, would be permanent, and that PC had plans in effect for her permanent role.

144.    On information and belief, PC subsequently hired and/or promoted at least two (2) males into Dr. Stewart's former role.

145.    On information and belief, Dr. Stewart's replacements were less experienced than her and less qualified for those roles.

### Providence College's Failure to Investigate

146.    On information and belief, PC made no reasonable efforts to investigate or remediate Dr. Stewart's complaints of gender discrimination prior to Dr. Stewart's employment termination.

147.    Indeed, it was not until February 5, 2024 that Dr. Stewart received an email from Tiffany Gaffney, PC's Interim Title IX Coordinator, regarding meeting to discuss Dr. Stewart's concerns "if you choose to do so."

148.    In response, Dr. Stewart wrote, "My initial disclosures of concerns about experiencing discrimination were reported to Rosemary several months ago. I'm unsure what exactly Rosemary has conveyed since then, but a lot of damage has occurred in the interim. Currently, I'm feeling quite uneasy on campus and am hesitant to discuss my experiences further due to concerns about potential retaliation."

149.    On March 2, 2024, Ms. Gaffney wrote, "Rosemary called me to report that you shard [sic] with her that you feel you may be on the receiving end of gender-based discrimination. She briefly cited a conversation you had with Steve N. about needing to smile more at Steve S. while talking about an employment opportunity. She did say that a lot has transpired related to the employment opportunity and that you might have more you would share."

***Dr. Stewart's Treatment After Being Told Her Employment Was Ending***

150.    Shortly following the January 22, 2024 meeting, Dr. Stewart discovered alterations to her title and biography on various campus websites.

151.    While Dr. Stewart recognized that she was helpless to save the title that she had earned months before, she was shocked to see her professional bio, which previously highlighted her contributions to the development and management of SAPS, had been significantly modified to wipe out acknowledgment of her work over the past five years.

152.    Witnessing PC's erasure of the objective account of her work and the program she had built without her consent was particularly distressing and disheartening.

153.    Moreover, to add insult to injury, PC refused Dr. Stewart's efforts to continue providing services to student-athletes, something she cares deeply about, on a contract basis or even without getting paid, which further supports sex/gender-based discriminatory and retaliatory animus on PC's part.

154.    That is because, at the time, PC was actively contracting with outside clinicians.

155.    On information and belief, PC allowed and paid other former employees to continue counseling student-athletes, including Dr. Cote (male).

***Post-Termination Retaliatory Treatment***

156.    Indeed, on June 4, 2024, following the end of Dr. Stewart's employment, Mr. English contacted Dr. Stewart to inform her that he attended a meeting with Christopher Neronha (VP of General Counsel), Ann Manchester-Molak (Executive Vice President of PC), Mr. Sears, Ms. Mal, and Mr. Napolillo and was told that he was not allowed to have Dr. Stewart work with the team on campus because "[Dr. Stewart] was planning to sue PC so [she] couldn't aid the students."

157.    Mr. English further noted that "the amount of vitriol that people had towards you—who admitted they had never spoken to you or heard your perspective on any of this—was concerning."

158.    The meeting referenced by Mr. English was organized by PC's administrators following Mr. English's repeated requests to have Dr. Stewart continue working with his team in an effort to support the best interests of the student-athletes.

159.    Indeed, at the time of this meeting referenced by Mr. English, Mr. English had been told by the psychologist who had been identified as the point of contact for athletics following Dr. Stewart's departure with the college (and PCC) that, moving forward, PCC would not be able to provide the same level of care that Dr. Stewart had due to resource constraints.

160.    At this point, Dr. Stewart had proposed to continue working with the men's basketball program as an independent contractor, even free of charge, in an effort to continue the work that she had started and deeply enjoyed as well as to begin to build back her career and portfolio after the record of her contributions had been erased by PC.

161.    This type of paid contract arrangement is common in college athletics - and at PC specifically.

162.    Mr. English told Dr. Stewart that he did not anticipate any issues implementing an independent contractor relationship.  In fact, Mr. English offered to pay Dr. Stewart out of his program budget.

163.    Nevertheless, PC rejected Mr. English's requests and advice, at the expense of its student-athletes, for no reason other than their discriminatory and retaliatory animus toward Dr. Stewart, a vindictive response that expressly harmed the student-athletes as well as Dr. Stewart.

164.    Moreover, PC's rejection of Dr. Stewart's offer was contrary to past practices of allowing the hiring of independent contractors for support services, especially when requested by men's basketball and in general.

165.    In fact, coaches were instructed to refer student-athletes to outside clinicians.

166.    However, following her termination, PC refused to refer student-athletes to Dr. Stewart and refused to reimburse Dr. Stewart for clinical work with student-athletes.

167.    Mr. Rock informed Dr. Stewart that Mr. Sears directed him not to reimburse Dr. Stewart for clinical work with students-athletes and that student-athletes should not be referred to Dr. Stewart, despite her qualifications and history with the program.

168.    Despite this, Dr. Stewart continued to see at least five PC student-athletes per week throughout the last year—without reimbursement—because it was clinically appropriate. As stated above, historically, the Personal Counseling Center at PC has had a practice of referring former staff clinicians to private practice after they leave PC. This situation deviates from that norm, especially considering that  at the time PC was actively contracting with outside clinicians.

169.    Subsequently, Dr. Stewart was informed by Dr. Cote, former Clinical Sport Psychologist at PC, that he was under the impression from Mr. Rock and Chris Bilder (new Associate Director of Clinical Sport Psychology at PC) that they were under instruction to identify clinical referrals for student-athletes, but not to use Dr. Stewart.

170.    Dr. Cote also stated that after he told Dr. Stewart about the initial efforts to block Dr. Stewart from referrals, Dr. Bilder was subsequently told to no longer refer to Dr. Cote  because of Dr. Cote's ongoing communication with Dr. Stewart.

171.    Finally, PC has wiped Dr. Stewart's names and contributions from its website despite its practice of maintaining names, titles, and contributions of former staff on its website.

172.    As an example, Piotr Piasecki (male), a former Mental Performance Coach at PC, is still listed on PC's website as a current employee following his separation from PC.  Dr. Cote (male) is still listed on PC's website as a former employee and included in rosters in the same way and manner as former PC employees and athletes are. Yet, Dr. Stewart's name has been removed from rosters she was previously listed on.

*** Gender Discrimination ***

173.    Dr. Stewart is a woman and female.

174.    For the reasons discussed above, PC's conduct by and through its agents and/or employees, constitutes sex and/or gender-motivated and unlawful discrimination under Title VII, FEPA, and RICRA

175.    The fact that Dr. Stewart is a woman was a motivating factor in her discriminatory treatment described above and in her eventual termination.

176.    The fact that Dr. Stewart raised concerns about the treatment of herself and other female employees by PC was a motivating factor in her discriminatory treatment and eventual termination.

177.    Adverse employment action based in whole or even in part on account of sex and/or gender constitutes prohibited discrimination and/or retaliation.

178.    Additionally, at all relevant times, Dr. Stewart was subjected to sex and/or gender based discriminatory conduct with the purpose or effect of unreasonably interfering with her work performance or creating an intimidating, hostile or offensive work environment including for the reasons set forth herein and other incidents.

179. PC's above-described working environment directed towards Dr. Stewart and other female employees amounts to conduct so severe and/or pervasive that it altered the conditions of her employment, thereby creating a hostile work environment.

180. Said discriminatory conduct resulted in Dr. Stewart having to endure working conditions that are both objectively and subjectively offensive.

181. PC's failure to follow its own policies and procedures relative to unlawful discrimination, harassment, and retaliation further supports an inference of discriminatory intent.

182. The temporal proximity of Dr. Stewart's protected conduct to PC's adverse employment action also raises a compelling inference of discriminatory and retaliatory intent.

### *Continuing Violation and Hostile Work Environment*

183. The discriminatory and/or retaliatory acts or omissions by PC set forth herein are parts of a continuing violation by PC such that each unlawful act and/or omission is actionable pursuant to the Continuing Violation Doctrine, including the hostile workplace which Dr. Stewart has been subjected to.

### *Pattern or Practice/Disparate Impact*

184. PC has engaged in a pattern or practice of discriminating against women/female employees.

185. Over the years, Dr. Stewart has observed numerous and pervasive incidents of gender/sex-based discrimination by PC and its agents, including those set forth above and the following:

   a. **Dismissive and Diminishing Language Toward Female Employees:** Mr. Sears instructed Dr. Mugan to reduce the use of "I" in her communications. This feedback was not observed to be given to male employees, creating a pattern that undermined her autonomy and voice.

b. **Gender-Based Criticism of Communication Styles:** On multiple occasions, Dr. Stewart was informed that her emails were considered "aggressive" and "too direct." ***This feedback was also cited as a reason for Dr. Stewart's dismissal by Father Sicard in a conversation with a former trustee.*** Mr. Napolillo, Mr. Rock, and others echoed these claims, despite some acknowledging they had never actually seen the emails in question. Male colleagues who used a similar tone in their emails were not subject to the same criticism.

c. **Physical Touch and Inappropriate Language:** A supervisee confided in Dr. Stewart about a female colleague who reported being called "sweetheart" and greeted with physical touch by Mr. Napolillo. Dr. Stewart advised the supervisee to report the incident to the Title IX coordinator, offering guidance on how to proceed and support for the colleague.

d. **Exclusion Based on Gender and Perceived Liability:** During a Men's Basketball practice session, Mr. Napolillo sat next to Dr. Stewart and expressed concern that being seen talking to her could negatively impact him. He stated that Dr. Stewart's close working relationship with a male coach, who strongly supported her continued work with the team, was viewed as problematic, specifically noting, 'you work closely with this coach, who is male, and now he is telling people he wants you to start and be part of his program." His comments implied that Dr. Stewart's gender complicated the situation and made her appear more of a liability in the eyes of PC's male-dominated Cabinet.

e. **Discriminatory Leadership Tactics:** Dr. Mugan and Dr. Stewart had numerous conversations about Mr. Sears's discriminatory treatment of women, particularly in Student Affairs. Dr. Mugan noted that valuable female employees, including Dr. Taiwo Adefiyiju-Monwuba, had left the institution, which she suspected was partly due to Mr. Sears's behavior. The two also discussed Mr. Sears's previous behavior, which made Dr. Stewart uncomfortable, leading her to modify her appearance to avoid unwanted attention.

f. **Stereotypical Assumptions About Female Leadership:** Mr. Napolillo made negative remarks about Jacqueline Peterson, a DEI advisor hired under former president Father Shanley, claiming she "affirmed negative stereotypes" and was not working out. She left the institution shortly after these comments, reflecting a bias against female leadership and DEI efforts.

g. **Gender Dynamics and Discrimination in Decision-Making:** Women, including Dr. Stewart, were frequently excluded from key decision-making processes and informal networking opportunities (e.g., golf outings, after-work drinks, and cabinet retreats). This exclusion limited women's access to professional growth and influence.

h. **Interruptions and Credit Appropriation:** Women, including Dr. Stewart, were often interrupted or dismissed when contributing to discussions. On at least one

occasion, a male colleague received credit for Dr. Stewart's work from another male colleague.  Similarly, Dr. Mugan raised concerns that Mr. Sears had taken credit for her work.

i.  **Retaliation for Speaking Out:** Dr. Mugan shared that when she raised concerns about gender dynamics with another female employee, she was told not to discuss the issue.  There was a clear understanding that those who reported discrimination faced retaliation, such as being ostracized or denied opportunities; this fear discouraged women from advocating for themselves or others.  Dr. Mugan later acknowledged to Dr. Stewart that she had not been an effective advocate for Dr. Stewart during her experience with retaliation, attributing this to Dr. Mugan's fear for her job security and her family's financial stability.

j.  **Gender-Based Double Standards:** Women, including Dr. Stewart, who asserted themselves in leadership or decision-making roles were often labeled as "aggressive" or "difficult," while men exhibiting the same behaviors were viewed as strong leaders.  This double standard created a culture where women were discouraged from speaking up, fearing negative perceptions.  This is something that Dr. Stewart experienced personally.

k.  **Appearance-Based Judgments:** Dr. Mugan reported that Mr. Sears had compared her appearance to Dr. Stewart's in a demeaning way, stating she "looked like a houseplant" compared to Dr. Stewart in meetings.  This unprofessional comment placed undue emphasis on female appearance over merit.

l.  **Cabinet Composition and Attrition of Female Leaders:** Under the current president, the number of women in PC's Cabinet has decreased by over 60%.  Talented women in leadership roles have left the college under the current administration.  Dr. Stewart observed this in both Student Affairs and Athletics.  Both divisions hired new male vice presidents without opening a search. Dr. Mugan noted that the abrupt departure of the former female Vice President of Student Affairs, Kristine Goodwin, was suspected to be the result of her being fired or forced out.

186.    Additionally and/or in the alternative, PC's employment policies or practices referenced herein, or the enforcement of said polices or practices, have a disproportionately adverse effect on female employees, including Dr. Stewart and other similarly situated coworkers, for the reasons set forth herein, such that PC has violated Title VII and the FEPA.

### Retaliation under Title VII and the FEPA

187.    Dr. Stewart complained to PC about widespread sex/gender-based discrimination in the workplace against herself and other employees.

188.    Under Title VII and FEPA, plaintiff is expressly protected from retaliatory conduct by an employer for voicing concerns of ongoing sex/gender discrimination with regard to herself and/or other individuals in the protected class.

189.    When Dr. Stewart reported that she believed there to be systemic sex/gender discrimination within PC, she was engaged in a protected activity.

190.    As described above, after engaging in the above-mentioned protected activity, PC demoted Dr. Stewart, cut her compensation, ostracized her in the workplace, subsequently terminated her employment without any prior notice, warning, or reason, and took other adverse action against Dr. Stewart as set forth above.

### Retaliation Under Rhode Island Whistleblowers' Protection Act

191.    Among other things, R.I. Gen. Laws § 28-50-3 prohibits an employer from taking adverse employment action against an employee "[b]ecause the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States."

192.    As described above, Dr. Stewart was engaged in protected conduct under the RI Whistleblowers' Protection Act when she repeatedly complained about ongoing race/color and sex/gender-based discrimination and harassment at PC.

193.    As described above, after engaging in the above-mentioned protected activity, PC demoted Dr. Stewart, cut her compensation, ostracized her in the workplace, subsequently

terminated her employment without any prior notice, warning, or reason, and took other adverse action against Dr. Stewart as set forth above.

### *Motivation to Discriminate and/or Retaliate*

194.    Adverse employment action based in whole or even in part on account of gender and/or sex constitutes prohibited discrimination.

195.    PC's patently false and fabricated attempt to justify the adverse employment actions taken against Dr. Stewart , including her attempted demotion and termination, is nothing more than pretext, which further supports an inference of discriminatory intent.

196.    An abrupt termination without prior warning, which is the case here, is an adverse employment action that gives rise to a compelling inference of discriminatory animus.

197.    PC's intent to discriminate against Dr. Stewart on account of her gender and sex and/or retaliate against Dr. Stewart for reporting unlawful discrimination is further established, in whole or in part, by conduct evidencing that PC's reasons for treating her adversely were pretextual and that discrimination motivated its decision, including:

    a.  PC's failure to follow its own policies and procedures;

    b.  PC's inexplicable deviation from its normal practices and procedures;

    c.  PC asserting false justifications for adverse conduct;

    d.  PC treating Dr. Stewart differently than other similarly situated employees;

    e.  PC asserting implausible, inconsistent, and/or contradictory justifications for adverse treatment of Dr. Stewart;

    f.  the absence of any documentation corroborating any legitimate non-discriminatory justification for adverse treatment;

    g.  the absence of credible justification for Dr. Stewart's adverse treatment; and,

    h.  the temporal proximity of Dr. Stewart engaging in protected conduct to PC's adverse treatment of her.

### *Damages*

198.     Despite its public "commitment" to diversity and non-discriminatory practices, PC has not put its commitment into practice and has failed to meet even the most basic Equal Employment Opportunity policies and laws with respect to women/female employees.

199.     Dr. Stewart's discriminatory treatment and subsequent termination have caused her great emotional distress.

200.     There was never a day at PC that Dr. Stewart did not have to endure acts of sexism, gender-based discrimination and mistreatment, and microaggression as a woman/female working in PC's athletics department.

201.     It has been absolutely exhausting and painful for Dr. Stewart to be constantly defending and justifying why she, as a woman, should be treated fairly and seen as a valued member of PC's team.

202.     The pain of reliving these awful moments on a daily basis has caused and continues to cause Dr. Stewart significant emotional distress.

203.     Additionally, PC's discrimination and retaliation against Dr. Stewart have been detrimental to her self-esteem, slandered her name, and damaged her relationship with colleagues, patients, and potential patients.

204.     On information and belief, PC's decision to demote Dr. Stewart and terminate her employment was part of PC's intentional practice of sex and/or gender discrimination and retaliation.

205.     PC is liable for Dr. Stewart's past lost wages, future lost wages, and additional monetary damages for economic and non-economic harm that Dr. Stewart has suffered or will suffer on account of PC's unlawful actions.

206.    PC's actions, including Dr. Stewart's termination, have had and will continue to have a devastating impact on Dr. Stewart's career and future opportunity for growth.

207.    Dr. Stewart has suffered equitable and compensatory damages, including, but not limited to, loss of income, pain and suffering, emotional distress, loss of enjoyment of life, loss of benefits, humiliation, damage to her professional and personal reputation and other great harm, as a result of being discriminated against by PC in the manner alleged herein.

## VII.    Claims for Relief

208.    Dr. Stewart repeats and re-alleges each and every allegation contained in paragraphs 1 through 207 of this Complaint in each of the counts below with the same force and effect as if set forth therein.

### Count One
### *Title VII of the Civil Rights Act of 1964,*
### *42 U.S.C. §2000e, et seq*

209.    Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's sex and/or gender and/or retaliated against Plaintiff for engaging in protected activity by reporting or complaining about gender/sex based discrimination in violation of Title VII, and thereby deprived Plaintiff of rights secured under Title VII, causing Plaintiff to suffer damages as aforesaid.

### Count Two
### *Rhode Island Fair Employment Practices Act*
### *R.I. Gen. Laws §28-5-1, et seq.*

210.    Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's sex and/or gender and/or retaliated against Plaintiff for engaging in protected activity by reporting or

complaining about gender/sex based discrimination in violation of the FEPA, and thereby deprived Plaintiff of rights secured under the FEPA, causing Plaintiff to suffer damages as aforesaid.

### Count Three
### *Rhode Island Civil Rights Act of 1990,*
### *R.I. Gen. Laws § 42-112-1, et seq.*

211.    Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment practices against Plaintiff on account of Plaintiff's sex and/or gender in violation of the RICRA, and thereby and otherwise deprived her of rights secured under the RICRA, causing her to suffer damages as aforesaid.

### Count Four
### *Rhode Island Whistleblowers' Protection Act,*
### *R.I. Gen. Laws § 28-50-1, et seq.*

212.    Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff for engaging in protected activity in violation of the RIWPA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the RIWPA.

### VIII.    Prayers for Relief

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1.    A declaratory judgment declaring that the acts and/or omissions of Defendant, including, but not limited to those complained of herein, are in violation of Title VII, FEPA, RICRA, and the RIWPA;

2.    An injunction directing Defendant to take such affirmative action as is necessary to refrain from such conduct and ensure that the effects of these unlawful employment practices are eliminated and not repeated;

3.      An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendant's unlawful conduct;

4.      An award of compensatory damages;

5.      An award of exemplary or punitive damages;

6.      An award of treble damages;

7.      An award of prejudgment interest, reasonable attorneys' fees, and costs; and,

8.      Such other and further relief as this Court deems just and proper.

## IX.      Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## X.      Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esq. and Danilo A. Borgas, Esq., as trial counsel.

> Plaintiff,
> Jessica P. Stewart
> By her attorneys,
> **SINAPI LAW ASSOCIATES, LTD.**

**Dated: July 7, 2025**                   /s/  **Danilo A. Borgas**
                                          **Danilo A. Borgas, Esq. (#9403)**
                                          **Richard A. Sinapi, Esq. (#2977)**
                                          2374 Post Road Suite 201
                                          Warwick, RI 02886
                                          Phone:  (401) 739-9690
                                          FAX: (401) 739-9490
                                          Email: dab@sinapilaw.com
                                                 ras@sinapilaw.com